UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |  |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) ) |  |
| Plaintiff, | ) ) | Hon. John R. Adams |
| v. | ) ) ) | Civil Action No. 22-1329 |
| ROBERT L. MURRAY, JR., | ) ) | Jury Trial Demanded |
| Defendant. | ) ) |  |

## AMENDED COMPLAINT

Plaintiff, Securities and Exchange Commission ("SEC"), alleges:

## SUMMARY

1. This case involves an unregistered, fraudulent offering of securities and the theft of investor funds by Defendant Robert F. Murray ("Murray"), a former U.S. Navy Chief who acted as an unregistered investment adviser to a private pooled investment fund, Deep Dive Strategies, LLC ("DDS" or the "Fund"). Murray conducted his fraud during September 2020 through January 2022, a period in which he resided in the North Canton, Ohio area and in Chicago, Illinois. Murray used the veneer of trustworthiness created by his U.S. Navy service to raise nearly $355,000 from approximately 44 investors—most of whom also were affiliated with

the Navy, either as active duty service members, reservists, or veterans. The investors in Murray's scheme were located throughout the United States, including at least two investors in the greater Chicago area.

2.     Before Murray raised the majority of Fund assets, he used social media to post about his purported successes in trading options contracts during the height of the Covid-19 pandemic. Murray touted his purported options trading acumen in a Facebook group with over 3,500 active duty, reservists and veterans of the U.S. Navy who shared an interest in investing (the "Goats Facebook Group"). Murray also created a channel on the Discord social media platform, where he live-streamed his trading activity and posted trading advice with a focus on options trading.

3.     As part of Murray's fraud, he created the Fund in September 2020 and solicited investors through February 2021. He told investors that their money would be placed in the Fund and used to invest in publicly-traded securities. Murray told investors orally and in writing that so long as they had been invested in the Fund for a year, they had a right to request a redemption of their investment in the Fund at the end of 2021. Murray also told investors that if they made this request, he would honor their request and give them their money back within 15 days of the date of the request, net of their *pro rata* share of Fund trading losses or profits and Fund expenses.

4.     During the scheme, Murray solicited prospective investors in the Fund through the Goats Facebook Group and Discord, and a number of them ultimately invested.

5.     Contrary to Murray's representations to investors that he would use their money to invest in publicly-traded securities, in October 2020 Murray almost immediately began spending Fund money on personal expenses. Murray also transferred investor funds from the

2

DDS bank account to his personal checking account, and withdrew cash from the DDS bank account with no apparent business purpose. In total, throughout the scheme, Murray misappropriated nearly 42% of the approximately $355,000 he raised from investors. Some of Murray's misappropriation occurred in the greater Chicago area.

6. Although Murray did cause DDS to invest in some publicly-traded securities, he lost nearly all of the funds he traded by the end of January 2021. DDS did not engage in any trading after January 2021, and Murray emptied the little that remained in DDS' brokerage account in February 2021.

7. By March 2021, Murray had cut off regular contact with investors and thereafter rebuffed their attempts to view an accounting of the Fund.

8. In the months thereafter, some investors requested to be redeemed from the Fund. Murray wrote to investors in August 2021 that he was willing to shut down the Fund and return the remaining money to investors. He never did so. Further, in January 2022, Murray failed to make redemptions to investors who had made redemption requests. To date, no Fund investors have received any return from the Fund.

9. Murray asserted his Fifth Amendment privilege during the SEC's pre-filing investigation in this matter.

10. By his misconduct, Murray violated the antifraud provisions of the Securities Act of 1933 ("Securities Act"), the Securities Exchange Act of 1934 ("Exchange Act"), and the Investment Advisers Act of 1940 ("Advisers Act"), and the registration requirements of Sections 5(a) and 5(c) of the Securities Act.

11. Unless Murray is permanently restrained and enjoined, he will continue to engage in the acts, practices, and courses of business set forth in this Complaint and in acts, practices, and courses of business of similar type and object.

## JURISDICTION AND VENUE

12. The SEC brings this action pursuant to Section 20(b) of the Securities Act, 15 U.S.C. § 78t(b); Sections 21(d) and 21(e) of the Exchange Act, 15 U.S.C. §§ 78u(d) and 78u(e); and Sections 209 and 214 of the Advisers Act, 15 U.S.C. §§ 80b-9 and 80b-14.

13. This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 78v(a); Sections 21(d)(3), 21(e), and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d)(3), 78u(e), and 78aa; and Sections 209 and 214 of the Advisers Act, 15 U.S.C. §§ 80b-9 and 80b-14. Murray, directly or indirectly, made use of the means and instrumentalities of interstate commerce or of the mails in connection with the acts, transactions, practices, and courses of business alleged in this complaint.

14. Venue in this District is proper pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and Section 214 of the Advisers Act, 15 U.S.C. § 80b-14, because Murray has transacted business in this District, and he conducted offers or sales of investments in the Fund in this District.

## DEFENDANT

15. **Robert L. Murray**, **Jr.** age 42, is currently a resident of Anchorage, Alaska, but resided in both North Canton, Ohio, and Chicago, Illinois, during the relevant time period. Murray is a retired Chief in the United States Navy. Murray organized DDS in North Canton, Ohio, in September 2020, and is its sole managing member. Murray is also the investment adviser to DDS. He had signing authority on all Fund bank and brokerage accounts.

**FACTS**

**Murray Uses his U.S. Navy Background as a Launchpad for DDS**

16. After Murray cultivated a perception of acumen in options trading among the members of the Facebook Group, he created and registered DDS as an LLC in Ohio in September 2020. Murray had sole control of financial accounts for DDS.

17. As a retired Navy Chief, Murray knew and took advantage of the trust in Navy Chiefs that is developed through service and special naval training.

**Murray Targets Prospective Investors with U.S. Navy Ties**

18. From September 2020 through February 2021, Murray, through DDS, offered and sold securities in the form of units of DDS membership interests to investors at $5,000 per unit (the "Offering").

19. In that period, Murray raised a total of approximately $354,800 from approximately 44 investors in 14 states, as well as active military members serving abroad.

20. Murray made written and oral representations about the intended use of proceeds in the Offering and the fees and expenses he could charge the Fund.

21. Murray provided a number of investors with two DDS documents that included disclosures about the use of proceeds raised in the Offering: an "Operating Agreement" and "Disclosure Statement" (together, "Offering Materials").

22. The Operating Agreement provided that DDS would trade in "various securities and utilize the markets in order to profit each member." The investment period was January 1, 2021 to December 31, 2021.

23. According to the Operating Agreement, at the end of the investment period, members were allowed to withdraw their investment plus any realized profits or minus any losses in a percentage equal to the investor's ownership in the Fund.

24. The Operating Agreement stated that Murray was entitled to an annual two percent administrative fee and 20 percent of any of the Fund's trading profits. The Offering Materials did not state that Murray was entitled to any separate salary or other compensation.

25. Similar to the Operating Agreement, the Disclosure Statement declared in pertinent part that the "primary purpose" of DDS was "to utilize the markets in order to profit each individual Member," and that each Member's contribution to DDS "shall be utilized and using [sic] various trading formats to enhance the profitability" of DDS.

26. The Disclosure Statement represented that the "annual two [percent] (2%) administrative fee . . . cover[ed] costs such as accounting, legal, filings or other charges."

27. The Disclosure Statement further declared that at the end of each calendar year beginning December 31, 2021, any DDS Member may request the total amount of the Member's investment less any profit or loss incurred, and the Member "shall receive within fifteen (15) days from the date of the initial request" all remaining funds in the Member's DDS account.

28. In addition to making written representations in the Offering Materials about how Murray would operate DDS, Murray also told a number of prospective Fund investors orally that DDS would use funds raised in the Offering to invest in publicly-traded securities and to pay disclosed expenses.

29. Murray did not tell prospective investors that their investments in the Fund would be used for anything other than investing in publicly-traded securities and paying Fund expenses.

30. Murray's oral and written statements through the Offering Documents represented that Murray would pool the money that investors contributed in the Fund and use the Fund's assets to make securities trades. The Operating Agreement stated that all investor returns would come from Fund trades that Murray made and any resulting profits. Murray further stated in the Disclosure Statement that "[i]n the event of any loss accumulated by each of the Member's account in the LLC during the calendar year, the Member/Manager [Murray] shall not be entitled to any funds designated as profit."

31. Murray's foray into trading securities for the Fund was brief and unsuccessful.

32. DDS lost most of its brokerage account value on January 13, 2021, when Murray lost a significant amount in GameStop options contracts. Murray made his last trade in the DDS brokerage account on January 23, 2021. This final failed trade was a bet on deeply risky options contracts that had the potential to lose all value within 24 hours, which they ultimately did. The DDS brokerage account was left with $161.98, which Murray later withdrew on February 4, 2021. In under a month, Murray lost almost all the Fund's money he used to trade securities.

**Murray Acted as the Investment Adviser to the Fund**

33. Investors in the Fund did not exercise any control or authority over the securities investments by the Fund. Instead, as DDS' managing member and investment manager, Murray decided how DDS invested its assets and selected the securities for the Fund. Murray received fees for his investment advisory services. Accordingly, he acted as an investment adviser to the Fund.

34. Murray used interstate commerce when he offered and sold investments in the Fund by, among other things, promoting investments in the Fund through the Goats Facebook Group, Discord, texts, emails, and telephone calls. Murray never filed a registration statement

7

with the SEC with respect to the offer and sale of investments in the Fund, and no registration statement has ever been in effect with respect to any offers or sales of investments in the Fund.

### Murray Misuses Investor Funds

35. Murray's oral and written representations to Fund investors about the intended use of proceeds in the Offering were false and misleading. Contrary to his representations, he used only part of the Fund's assets to trade securities. Instead, Murray misappropriated nearly 42% of the funds raised.

36. In total, Murray misappropriated approximately $148,000 from the Fund. He misused Fund money for personal purposes, including approximately $8,700 though debit card expenses/checks; $83,500 through cash withdrawals; and $58,800 through transfers to his personal account. These amounts total $151,000. However, based on the Offering Materials, he was permitted to charge the Fund an annual amount of $7,096 in administrative fees (2% of $354,800). The Fund paid $4,016 in expenses covered by the administrative fee, leaving $3,080 in remaining administrative fees that Murray was permitted to charge the Fund. When this remaining $3,080 in administrative fees is deducted from the $151,000 that Murray misused for personal purposes, the total amount of Murray's misappropriation equals approximately $148,000.

37. Murray's misappropriation began almost immediately. On October 15, 2020, DDS received its first investor funds. On October 18, 2020, three days later, Murray used the DDS debit card and spent $638.99 at Helzberg Diamonds.

38. Despite completing his final trade on behalf of the Fund on January 23, 2021, between January 23, 2021 and February 11, 2021, Murray collected $37,300 total from three current Fund investors and one new investor. He did not deposit these funds in DDS' brokerage

account, but instead, gradually misappropriated the funds from the DDS bank account. Indeed, Murray emptied the DDS brokerage account through a $161.98 withdrawal on February 4, 2021. Murray continued using the account for personal expenses, depositing and withdrawing personal funds, until only $1 remained as of February 2022.

39. Murray transferred Fund monies to his personal account and withdrew cash from the Fund bank account on days he gambled at casinos in Cleveland and other locations in the Midwest. For example, on February 2, 2021, Murray transferred $10,000 from the Fund's bank account to his personal bank account. Prior to the transfer, Murray's personal bank account had a balance of $760.41. Nine minutes after making the transfer, Murray purchased $10,400 in casino chips from a Cleveland casino using the same personal bank account.

40. On other occasions, Murray withdrew or transferred money from the Fund bank account into his personal bank accounts, on days when he was gambling at other casinos in the states of Indiana, Wisconsin, and Ohio.

## CLAIMS FOR RELIEF

### COUNT I

**Violations of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)]
and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder**

41. The SEC realleges and reincorporates by reference the allegation set forth in paragraphs 1 through 40 above.

42. By engaging in the conduct described above, Murray, directly or indirectly, singly or in concert with others, by use of the means or instrumentality of interstate commerce, or by the use of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of securities, has: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts

9

necessary in order to make statements made, in the light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices and courses of business which operated or would have operated as a fraud or deceit upon purchasers of securities and upon other persons.

43. Murray knew or was reckless in not knowing of the activities described herein.

44. By reason of the foregoing, Murray violated, and unless enjoined will likely again violate, Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## COUNT II

### Violations of Section 17(a)(1) of the Securities Act
### [15 U.S.C. § 77q(a)(1)]

45. The SEC realleges and reincorporates by reference the allegation set forth in paragraphs 1 through 40 above.

46. By engaging in the conduct described above, Murray, directly or indirectly, singly or in concert with others, in the offer and sale of securities, by use of the means and instruments of transportation and communication in interstate commerce and by use of the mails, has employed devices, schemes or artifices to defraud.

47. Murray knew or was reckless in engaging in the activities described herein.

48. By reason of the foregoing, Murray violated, and unless enjoined will likely again violate, Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT III

### Violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act
### [15 U.S.C. § 77q(a)(2) and (3)]

49. The SEC realleges and reincorporates by reference the allegation set forth in paragraphs 1 through 40 above.

50. By engaging in the conduct described above, Murray, directly or indirectly, singly or in concert with others, in the offer and sale of securities, by use of the means and instruments of transportation and communication in interstate commerce and by use of the mails, has: (a) obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (b) engaged in transactions, practices or courses of business which operate or would operate as a fraud or deceit upon the purchaser.

51. Murray was negligent in engaging in the activities described herein.

52. By reason of the foregoing, Murray violated, and unless enjoined will likely again violate, Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

## COUNT IV

**Violations of Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a), (c)]**

53. The SEC realleges and reincorporates by reference the allegations set forth in paragraphs 1 through 40 above.

54. Murray: (a) without a registration statement in effect, directly and indirectly, made use of the means and instruments of transportation or communications in interstate commerce or of the mails to sell securities through the use or medium of any prospectus or otherwise, and (b) without a registration statement in effect, directly and indirectly, made use of the means and instruments of transportation or communication in interstate commerce or of the mails to offer to sell through the use or medium of a prospectus or otherwise, securities as to which no registration statement had been filed; all in violation of Securities Act Sections 5(a) and 5(c) [15 U.S.C. §§ 77e(a), (c)].

55. By reason of the conduct described above, Murray, directly or indirectly, violated, is violating, and, unless enjoined, will continue to violate Securities Act Sections 5(a) and 5(c) [15 U.S.C. §§ 77e(a), (c)].

## COUNT V

### Violations of Section 206(1) of the Advisers Act [15 U.S.C. § 80b-6(1)]

56. The SEC realleges and reincorporates by reference the allegations set forth in paragraphs 1 through 40 above.

57. At all relevant times, Murray acted as an "investment adviser" within the meaning of Section 202(a)(ll) of the Advisers Act [15 U.S.C. § 80b-2(a)(ll)].

58. By engaging in the conduct described above, Murray, while acting as an investment adviser, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, employed devices, schemes, or artifices to defraud clients or prospective clients.

59. Murray knew or was reckless in engaging in the activities described herein.

60. By reason of the foregoing, Murray has violated and, unless enjoined, will likely again violate, Section 206(1) of the Advisers Act [15 U.S.C. § 80b-6(1)].

## COUNT VI

### Violations of Section 206(2) of the Advisers Act [15 U.S.C. § 80b-6(2)]

61. The SEC realleges and reincorporates by reference the allegations set forth in paragraphs 1 through 40 and 57 above.

62. By engaging in the conduct described above, Murray, while acting as an investment adviser, by use of the mails or any means or instrumentality of interstate commerce,

directly or indirectly engaged in transactions, practices, or courses of business which operate as a fraud or deceit upon clients or prospective clients.

63. Murray was negligent in engaging in the activities described herein.

64. By reason of the foregoing, Murray has violated and, unless enjoined, will likely again violate, Section 206(2) of the Advisers Act [15 U.S.C. § 80b-6(2)].

## COUNT VII

**Violations of Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)], and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8]**

65. The SEC realleges and reincorporates by reference the allegations set forth in paragraphs 1 through 40 and 57 above.

66. By engaging in the conduct described above, Murray, while acting as an investment adviser, directly or indirectly, by use of the mails or means or instrumentalities of interstate commerce, engaged in acts, practices, or courses of business that were fraudulent deceptive, or manipulative.

67. By engaging in the conduct described above, Murray, while acting as an investment adviser to a pooled investment vehicle: (a) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, to investors in the pooled investment vehicle; and (b) engaged in acts, practices and courses of business that were fraudulent, deceptive, or manipulative with respect to investors in the pooled investment vehicle.

68. Murray was negligent in engaging in the activities described herein.

69. By reason of the foregoing, Murray has violated, and unless enjoined, will likely again violate, Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)], and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

**RELIEF REQUESTED**

WHEREFORE, the SEC respectfully requests that the Court:

a. Issue findings of fact and conclusions of law that Murray committed the violations charged and alleged herein.

b. Enter an Order of Permanent Injunction restraining Murray, his officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, who receive actual notice of the Order, by personal service or otherwise, from, directly or indirectly, engaging in the transactions, acts, practices or courses of business described above, or in conduct of similar purport and object, in violation of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rules l0b-5(a),(b), and (c) thereunder [17 C.F.R. § 240.10b-5(a), (b), and (c)], Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), 77q(a)], Section 206(1) and (2) of the Advisers Act [15 U.S.C. § 80b-6(1), (2)], and Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)], and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

c. Enter an Order requiring Murray to disgorge the ill-gotten gains that he received, directly or indirectly, as a result of his wrongful conduct, plus prejudgment interest thereon.

d. Enter an Order imposing an appropriate civil penalty upon Murray pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)].

e. Enter an Order barring Murray from serving as an officer or director of any entity having a class of securities registered with the SEC pursuant to Section 12 of the Exchange Act [15 U.S.C § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C § 78o(d)], pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C § 78u(d)(2)].

  f.  Grant such orders for further relief the Court deems appropriate.

## JURY DEMAND

Pursuant to Rule 39 of the Federal Rules of Civil Procedure, the SEC demands that this case be tried before a jury.

Respectfully submitted,

DATED: October 17, 2022

s/Eric M. Phillips
ERIC M. PHILLIPS (IL Bar # 6237871)
JACLYN J. JANSSEN (IL Bar # 6286480)
MATTHEW T. WISSA (IL Bar # 6324860)
Attorneys for Plaintiff
U.S. SECURITIES AND EXCHANGE COMMISSION
175 West Jackson Boulevard, Suite 1450
Chicago, Illinois 60604
Telephone: (312) 353-7390
Facsimile: (312) 353-7398
Email: Phillipse@sec.gov
Email: janssenj@sec.gov
Email: wissam@sec.gov